UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------x
WILLIAM METCALF,                              :
                                              :         CIVIL ACTION NO.:
            Plaintiff,                        :
                                              :         3:15-cv-1696 (VAB)
v.                                            :
                                              :
YALE UNIVERSITY,                              :
                                              :
            Defendant.                        :         November 9, 2018
-------------------------------------------------------x

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISQUALIFY AND FOR PROTECTIVE ORDER

**I.      INTRODUCTION**

Yale has moved to disqualify the entire law firm representing William Metcalf, alleging that Connecticut Rule of Professional Responsibility 4.2 requires the Court to take this extraordinary action. Yale contends that a 34-minute telephone conversation between one of Metcalf's lawyers and Yale professor Kirk Freudenburg somehow "taints the integrity of the trial." This is so, Yale argues, because Freudenburg was a person with "managerial responsibility" at Yale and because he assertedly participated in Yale's decision to terminate Metcalf — the decision at the center of this case.   (Dkt. No. 99-1, Def. Mem., at 2.)

Yale's motion is meritless. First, Freudenburg played no role in the decision to terminate Metcalf. Second, Freudenburg volunteered to testify on Metcalf's behalf at Metcalf's Yale grievance hearing in June 2015. Third, Freudenburg testified at that grievance proceeding to virtually everything he and Metcalf's counsel discussed in their telephone call. Fourth, Yale has offered no evidence or argument to support its bald assertion that Freudenburg disclosed — or even knew of — information about Yale's litigation strategy, let alone any privileged

communications, confidential information, or attorney work product. The motion to disqualify Metcalf's counsel should be denied.

II.  **STATEMENT OF FACTS**

    A.  **Freudenburg Was Not a Decision-Maker concerning Metcalf's Termination.**

Metcalf started working at Yale in 2002 and held jointly-funded positions as an adjunct Professor in the Classics Department and as Curator of Coins and Medals in the Art Gallery. (Exh. 1.) He had good reviews during those years. In 2010, Metcalf received a letter from Jock Reynolds, Director of the Art Gallery, and Christina Krauss, then-Chair of the Classics Department, notifying him that his positions at the Art Gallery and on the Classics faculty were being renewed for a five-year term, with his time continuing to be shared between the two. (Exh. 2.) His reviews remained good until his abrupt termination.

Metcalf was terminated in August 2014, before his 2010 renewal contract had expired. As the chronology of Metcalf's termination illustrates. (Exh. 3.) It was Reynolds alone who decided to terminate Metcalf's employment. And, when he did so on August 29, 2014, Freudenburg had no knowledge of the termination, let alone a role in it. Indeed, Reynolds testified at his deposition that: "I was the sole decision-maker." (Exh. 4.)

        1.  **Jock Reynolds Unilaterally Decides to Terminate Metcalf's Employment.**

In March 2014, Freudenburg notified John Mangan, an Associate Dean, that the Classics faculty had voted to approve Metcalf's newest contract renewal, and in July, Classics submitted the "[r]eappointment paperwork" for a term to run from July 2015 through June 2020. On August 26, Tara Noel from Yale Human Resources emailed a chronology of Metcalf's employment history to Reynolds. (Exh. 3.) Noel explained that Bill Metcalf's "reappointment was

processed one year earlier than originally planned and was done through Classics without the normal collaboration with the Gallery, typically resulting in a joint letter to Bill from the Chair of Classics (Kirk Freudenburg) and you." As Noel informed Reynolds:

> BM's appointment date has been adjusted from 6/30/19 to 6/30/20, but I wanted to raise the issue of the reappointment timing and unplanned expense with the hope that the joint letter confirming the correct reappointment dates and salary could, <u>in the least, be discussed with Kirk Freudenburg</u>, or drafted and sent to BM as in the past.

(*Id.* (emphasis added).) Freudenburg, as of this date, fully expected Metcalf's employment to continue.

In an August 29 email, Reynolds disclosed to Freudenburg — for the very first time — that he had fired Metcalf from the Gallery:

> I personally handed Bill Metcalf his letter of dismissal with Sheila Sautter of Yale's HR office present with me during the last hour. Bill is presently packing up his personal belongings in YUAG's Coins and Medals office under the supervision of our Frank Biceglia, YUAG's Manager of Security. Bill's employment <u>with the Gallery</u> ends today and he now knows from the letter I presented to him that you will be contacting him soon.
>
> As you might guess, Bill has not accepted this termination well and he may well choose to grieve it. I suggested that he instead consider tendering a resignation for personal or medical reasons, but have no idea of what he will choose to do going forward.
>
> Given all that has transpired, I wish you well with the tough work and decision that you and your colleagues <u>will have to make regarding Bill's faculty appointment</u>.

(Exh. 5 (emphasis added).)

This email demonstrates several important points: (1) Freudenburg had no knowledge Reynolds was going to fire Metcalf; (2) Reynolds made no decision about Metcalf's position in Classics; and (3) <u>no</u> decision of any kind about Metcalf's position in Classics had even been

–3–

contemplated by Freudenburg (except the anticipated renewal of Metcalf's contract for another five years).

**2. Freudenburg Helps Metcalf As Much As He Can.**

After learning of Metcalf's termination from the Gallery, Freudenburg and others devoted substantial time and effort to ensure that Metcalf would continue as a Classics faculty member, and that the 11% of his compensation and benefits that were the Classics Department's responsibility continued through the end of 2014. (Exh. 6.)

Contrary to Yale's representations, Freudenburg's only involvement with Metcalf's employment in Classics was to try to extend it as long as possible, not to terminate it. The efforts are summarized in an October email from Alexa Schlieker (the "finance person" in Classics) to Karen Wu (in HR):

> Bill Metcalf should get paid the portion [of his salary] he always received from the Classics Department ($1,123) until the whole situation is resolved. In ORACLE [a Yale employment database] his appointment is end dated as of 6/30/2015. However, his labor schedule for the Classics pay is end dated as of 12/31/14 and therefore his labor charge is currently in suspense. The form Kirk Freudenburg signed (change the labor schedule end date to 12/31/14) will avoid his pay to be in labor suspense, but rather charged to the account it was always charged to. … It is also my understanding that he should receive employee benefits until the whole situation is resolved.

(*Id.* (emphasis added).) So, rather than being involved in the decision to terminate Metcalf, Freudenburg actually tried to help Metcalf as much as he could, ensuring that he would get paid and receive benefits through 2014. Freudenburg's effort to keep Metcalf "as is" in the Classics Department as long as possible was then approved by Yale HR. (Exh. 7.)

The document Yale offered as evidence of Freudenburg being "involved in the termination process" is evidence, in reality, of exactly the opposite. (Def. Mem., Exh. A.) Far

from participating in the termination decision, Freudenburg tried to ease Metcalf's departure from Classics. That departure was inevitable, though, because Classics simply lacked the financial resources to pay Metcalf past the end of the year.

### 3. Yale's Interrogatory Responses and the Grievance Hearing Testimony Confirm that Freudenburg Played No Part In Metcalf's Termination.

There is other evidence — sworn under oath — that Freudenburg played no part in Metcalf's termination. Interrogatory No. 2 in Plaintiff's First Set of Interrogatories asked: "Please identify all persons with material knowledge of the reason(s) for plaintiff's termination." In its response — certified as true by Jock Reynolds — Yale identified just five people: Jock Reynolds; Sheila Sautter; Laurence Kanter; Jamaal Thomas and Valerie Stanley. Notably absent from this list is Professor Freudenburg. Yale was also asked who decided to terminate Metcalf's employment. It responded (again, under oath):

> "Jock Reynolds made the decision to terminate the plaintiff, with input from Laurence Kanter, Jamaal Thomas and representatives of Yale University's Human Resources Department."

Again, no mention of Kirk Freudenburg.

If any doubt about Freudenburg's lack of involvement in the termination decision still remains, the summary of Metcalf's grievance proceeding eradicates it. Freudenburg voluntarily agreed to testify for Metcalf at the grievance hearing, and he did so. In response to discovery requests in this case, Yale produced Yale-employee Geraldine Sullivan's written summary of that testimony. (Exh. 8.) The testimony reveals the following:

- When Reynolds approached Freudenberg about Metcalf, Freudenberg "wasn't sure why JR [Reynolds] wanted to meet. I did a quick study of [Metcalf's] file to remind myself of the arrangement [between Classics and the Yale Art Gallery]."

- When Reynolds told Freudenberg that Metcalf had been fired, Freudenburg's response was "[i]t was a big surprise to me."

- When asked again what his reaction was when he learned about the termination, Freudenburg simply said: "I was stunned. I came prepared to talk about salary. I wasn't sure what would happen next. I wasn't sure what would happen with [Metcalf's] position in Classics. I knew that [Metcalf's] salary was so heavily connected to the [Yale Art Gallery] curatorship."

- When asked if the termination decision was "unilateral," Freudenberg responded: "yes, Classics did not have any input." He added that he had never "had conversations with Jock about Bill."

In short, the evidentiary record unambiguously establishes that Freudenburg had no involvement in Yale's decision to terminate Metcalf.

    B.    **<u>Plaintiff's Counsel's Telephone Conversation with Professor Freudenburg Tainted Nothing</u>**.

More than three years later, after Yale produced Interrogatories and the Sullivan minutes, Metcalf's counsel telephoned Freudenburg in anticipation of calling him as a witness for Metcalf at trial. The purpose was to confirm Freudenburg's testimony at the grievance hearing. Attorney Levin-Epstein initially called in mid-August 2018 and left a voicemail indicating that Metcalf's counsel was trying to reach him. Approximately one week later, on August 30, Attorney Levin-Epstein called Freudenburg again. Freudenberg answered. Counsel again identified himself and asked if Freudenburg would be willing to talk briefly about the case. Freudenburg agreed, with the caveat that he was about to teach a class so the conversation might have to be interrupted. At no time was Freudenburg asked to discuss anything about defense strategy, conversations he had with defense counsel, or anything concerning the defense of the case. At no time did he volunteer such information. As Yale's Motion seems to concede, defense counsel did

not even speak to Freudenburg about Metcalf until approximately mid-October 2018. (*See* Def. Mem. at 2.)

Yale has asserted that this conversation violated Rule 4.2. After reading Yale's motion and reviewing Rule 4.2 and its Commentary closely in light of Yale's allegation, we concede that the conversation was an inadvertent technical violation of the Rule. It was inadvertent because, in light of Freudenburg's history with Metcalf and the fact that he voluntarily testified on his behalf at the grievance hearing, we properly identified Freudenburg as a Plaintiff's witness. It was technical because there was no intent or effort to obtain an unfair advantage by interviewing a person we appropriately considered to be a witness favorable to our client and willing to be a witness for him. The conversation did not prejudice Yale in any way, and Yale has produced no evidence of prejudice.

The Court indicated in its conference with all counsel that Attorney Levin-Epstein's notes of his call with Freudenberg were not necessary to produce. However, these notes will confirm that there was absolutely no discussion of or effort by Attorney Levin-Epstein to obtain confidential, privileged, or attorney work product information from Freudenburg. Indeed, the information Freudenburg provided was substantially the same information he had provided when he testified at the grievance hearing more than three years earlier.

### III. APPLICABLE LAW

#### A. Yale Bears the Burden of Proof To Show that Its Motion to Disqualify Should Be Granted. It Does Not and Cannot Meet That Burden.

Motions to Disqualify in the Second Circuit are governed by *Board of Education of City of New York v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979). *Nyquist* establishes that:

> Disqualification may occur "with rare exceptions … only in essentially two kinds of cases: (1) … conflict of interests … or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 and 9, thus giving his present client an unfair advantage."

*Id.* at 1246. The Second Circuit expressed its "considerable reluctance to disqualify attorneys despite misgivings about the attorney's conduct," explaining that the reluctance "derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons." *Id.* Unless there is a taint to the underlying trial, then, alleged ethical violations do not warrant disqualification.

This is not to say that disqualifications are never appropriate. Indeed, as Yale discusses in its brief, the sort of "rare exception" noted by the *Nyquist* court occurred in *MMR/Wallace Power & Industrial v. Thames Associates*, 764 F.Supp. 712 (D. Conn. 1991). There, Chief Judge Burns held that an attorney's *ex parte* contact with a former employee of an adverse party required disqualification. But that was because the former employee had actually been a member of the adverse party's litigation team, had confidential or privileged information, and actually disclosed such information to the attorney who contacted him. Chief Judge Burns held that, under those circumstances, the attorney's continued representation of his client threatened to "taint" further proceedings in the case.

The issue of disqualification has been recently re-examined by Judge Haight. *See Ardemasov v. Citibank, N.A.,* 14 F. Supp. 3d 39 (D. Conn. 2014). There, the defense moved to disqualify plaintiff's counsel on the ground that he would be called as a witness in the case. Judge Haight first reviewed the salient legal doctrines, noting that: (1) courts should attempt to balance

–8–

a client's right freely to choose counsel against the need to maintain the highest standards of the profession; (2) the focus of inquiry is on whether an attorney's conduct would tend to taint the underlying trial; (3) the moving party bears the heavy burden of proving facts required for disqualification; and (4) the correct test for disqualification is a restrained approach. Judge Haight further noted that, "in view of their potential for abuse as a tactical device, motions to disqualify opposing counsel are subject to particularly strict scrutiny," and "the Second Circuit requires a high standard of proof on the part of the party seeking to disqualify an opposing party's counsel." *Id.* at 54. On this basis, Judge Haight denied the motion.

Yale argues that Metcalf's chosen law firm should be disqualified because the firm either had or likely had access to relevant privileged information. The problem is that Yale offers no evidence to support its argument. Yale has submitted the affidavit from Freudenburg, but he makes no claim that Attorney Levin-Epstein talked to him about any matters relating to Yale's defense. That is because he did not. After all, Attorney Levin-Epstein spoke with Freudenburg in August 2018; the first time that Freudenburg spoke with Yale's counsel was in October 2018.

**B.     Yale Knew or Should Have Known That Freudenburg Was Going to Be a Witness for Metcalf.**

Freudenburg testified on Metcalf's behalf at the grievance hearing in 2015. Throughout this litigation, Yale has never mentioned Freudenberg as one of its witnesses, nor has it even indicated that he is a person with knowledge of the underlying dispute. After three years of litigation, in late September 2018, Attorney Noonan asked Attorney Garrison for names of Yale personnel that Metcalf might call as witnesses, on the ground that he wanted to ensure that they would be present for trial. Freudenburg was among the people Attorney Garrison identified. In all likelihood, it was this identification that first prompted Yale's counsel to speak with Freudenberg.

Under these circumstances, it may be fair to say that, if Freudenburg was "represented" at all in this case, his allegiance to Metcalf means he would be at least as likely to work with Metcalf's lawyers as he would be to work with Yale's. Attorney Levin-Epstein's communications with a friendly witness — to confirm that his memory now is the same as it was when he testified for Metcalf in 2015 — should not be discouraged by a formalized reading of Rule 4.2. It should not be the law that a friendly managerial witness must be deposed for no reason other than to confirm the testimony he had voluntarily given in an earlier proceeding. To subject a party to that type of unnecessary cost would be contrary to the dictates of Rule 1 of the Federal Rules: "to secure the just, speedy, and inexpensive determination of every action and proceeding." Yale has not been prejudiced by Attorney Levin-Epstein's contact with Freudenburg; its attorneys may contact Freudenburg whenever they desire. But this Court should allow Attorney Levin-Epstein to continue, as necessary, to prepare Freudenburg for trial testimony. Trials are, after all, meant to be a search for the truth. In no respect does trial preparation of a witness inhibit that search; instead, it enhances it.

## IV.  CONCLUSION

Yale has not satisfied its heavy burden of proof to show that disqualification is appropriate. Its Motion should be denied.

                            **RESPECTFULLY SUBMITTED,**
                            **THE PLAINTIFF**

By:   */s/ Joseph D. Garrison*
        Joseph D. Garrison (*ct04132*)
        Ethan Levin-Epstein (*ct01566*)
        GARRISON, LEVIN-EPSTEIN,
            FITZGERALD & PIRROTTI, P.C.
        405 Orange Street
        New Haven, Connecticut   06511
        Tel.:   (203) 777-4425
        Fax:   (203) 776-3965
        Email: jgarrison@garrisonlaw.com
        Email: elevin-epstein@garrisonlaw.com

## CERTIFICATION

    I HEREBY CERTIFY that, on this 9th day of November, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                                          /s/ *Joseph D. Garrison*
                                                                Joseph D. Garrison